Case No. 07-23020-CIV-UNGARO

DARRIN CUPO, D.M.D, P.A., a Florida
corporation, and DARRIN CUPO, D.M.D.,
an individual,

      Plaintiffs,

vs.

ORTHODONTIC CENTERS OF AMERICA,
INC., a Delaware corporation n/k/a
ORTHOSYNETICS, INC., a Delaware
corporation, and ORTHODONTIC CENTERS
OF FLORIDA, INC., a Delaware corporation,

      Defendants.

_____/

## OMNIBUS ORDER

THIS CAUSE is before the Court upon Defendants' Rule 56(f) Motion for Extension of
Time to Respond to Plaintiffs' Premature Cross-Motion for Summary Judgment as to Count II of
Plaintiffs' Complaint, filed December 31, 2007.  (D.E. 18.)  Plaintiffs filed their Memorandum of
Law in Opposition to Defendants' Rule 56(f) Motion on January 3, 2008, (D.E. 21) to which
Defendants filed a Reply on January 7, 2008.  (D.E. 24.)  The matter is ripe for disposition.

THE COURT has considered the Motion and the pertinent portions of the record and is
otherwise fully advised in the premises.

By way of background, this action involves a dispute over Defendants' alleged failure to
adhere to the terms of a Management and Business Services Agreement ("BSA") entered into
between Plaintiffs Darrin Cupo, D.M.D., P.A., a Florida corporation and Darrin Cupo, D.M.D.,

individually (collectively "Cupo"[1]), and Defendants, Orthodontic Centers of America, Inc. n/k/a

Orthosynthetics, Inc., a Delaware corporation and Orthodontic Centers of Florida, Inc., a

Delaware corporation (collectively "OCA"), effective May 1, 1996. (Notice of Removal, Ex. A

(Compl. ¶ 9).) The Complaint—filed in the Circuit Court of the Eleventh Judicial Circuit in and

for Miami-Dade County, Florida, on October 19, 2007, and removed to this Court on November

20, 2007 on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332 and 28 U.S.C. §

1441—consists of two counts, including claims for breach of contract (Count I) and for

declaratory relief (Count II). Plaintiffs seek money damages for injuries suffered as a result of

Defendants' alleged breach of contract or, in the alternative, a declaration by the Court that the

BSA is illegal and unenforceable under Florida law. (Notice of Removal, Ex. A.)

Before the action was removed to this Court, Defendants filed a Motion to Dismiss Count

II. (Notice of Removal (Defs.' Mot. to Dismiss Count II).) On December 3, 2007, Defendants

filed a Request for Judicial Notice and Incorporated Memorandum of Law (D.E. 4),[2] requesting

that the Court take judicial notice of certain papers filed in litigation in the case styled Mark A.

Yaffey and Mark A. Yaffey Orthodontic Group, P.A. v. Orthalliance, Inc., Case No. 01-3715-

CIV-MORENO, United States District Court for the Southern District of Florida ("Yaffey

Action"), which Defendants incorporated by reference in the Motion to Dismiss Count II.

(Notice of Removal (Defs.' Mot. to Dismiss Count II ¶ 4 n.3).) On December 20, 2007 Plaintiffs

filed their Memorandum in Opposition to Defendants' Motion to Dismiss Count II, (D.E. 11) and

their Limited Objection to Defendants' Request for Judicial Notice. (D.E. 10.) Also on

---

[1]The Court notes that Plaintiffs refer to Plaintiffs Darrin Cupo, D.M.D., P.A., and Darrin Cupo, D.M.D., collectively as "Cupo" throughout the complaint and other papers they have filed.

[2]Also on December 3, 2007, pursuant to Local Rule 7.2, Defendants filed their Memorandum of Law in Support of the Motion to Dismiss Count II. (D.E. 5.)

December 20, 2007 Plaintiffs filed a Cross-Motion for Summary Judgment as to Count II of Plaintiffs' Complaint.  (D.E 12.)

I.      DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

Defendants request that the Court take judicial notice of certain papers filed in litigation in the Yaffey Action, which Defendants incorporated by reference in the Motion to Dismiss Count II.  In response, Plaintiffs do not object to the Court taking judicial notice of the existence or authenticity of the documents, but Plaintiffs do object to the Court taking judicial notice of "the truth of the facts supporting orders in the Yaffey Action as they may concern the application of Florida law to the distinct facts of Cupo's contract and business relationship with OCA." (Pls.' Objection to Defs.' Request for Judicial Notice ¶ 5.)

Federal Rule of Evidence 201 "governs only judicial notice of adjudicative facts."  Fed. R. Evid. 201(a).  Federal Rule of Evidence 201(b) provides: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The Eleventh Circuit has found that "[i]n order for a fact to be judicially noticed under Rule 201(b), indisputability is a prerequisite."  *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citing 21 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5104 (1977 & Supp. 1994)).  "Since the effect of taking judicial notice under Rule 201 is to preclude a party from introducing contrary evidence and in effect, directing a verdict against him as to the fact noticed, the fact must be one that only an unreasonable person would insist on disputing."  *Id*. "If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous."

*Id.*

Applying these principles, the Eleventh Circuit has held that "a court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation." *Id.* (citing *United States v. Garland*, 991 F.2d 328, 332 (6th Cir. 1993); *Colonial Leasing Co. v. Logistics Control Group Int'l*, 762 F.2d 454, 459 (5th Cir. 1985); *St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp.*, 605 F.2d 1169, 1172-73 (10th Cir. 1979); *ITT Rayonier, Inc. v. United States*, 651 F.2d 343, 345 n.2 (5th Cir. 1981); *Moore v. Estelle*, 526 F.2d 690, 694 (5th Cir. 1976); *FDIC v. O'Flahaven*, 857 F. Supp. 154, 157-58 (D.N.H. 1994)). In other words, the Eleventh Circuit has held that "even though a court may take judicial notice of a 'document filed in another court . . . to establish the fact of such litigation and related filings,' a court cannot take judicial notice of the factual findings of another court." *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998) (describing the Eleventh Circuit's holding on the issue of whether a court can take judicial notice of the factual findings of another court) (citing *Jones*, 9 F.3d at 1553).

Accordingly, for the limited purpose of recognizing the "judicial act" that each document represents or the subject matter of the Yaffey Action litigation, the Court takes judicial notice of the following papers filed in the Yaffey Action: (a) Notice of Removal dated August 30, 2001 (including the Complaint for Declaratory Judgment and all documents attached thereto); (b) Defendant's Motion for Summary Judgment dated June 7, 2002; (c) Memorandum of Law in Support of Orthalliance, Inc.'s Motion for Summary Judgment dated June 7, 2002; (d) Report and Recommendation entered on February 14, 2003 by Magistrate Judge Barry L. Garber; (e) Order adopting the Report and Recommendation entered on March 26, 2003 by Judge Federico A. Moreno. (Defs.' Request for Judicial Notice ¶¶ 2-4 & Exs. A-E.) However, the Court does

not take judicial notice of the court's findings of fact in the Yaffey Action.

II.     DEFENDANTS' MOTION TO DISMISS COUNT II WITH PREJUDICE

        A.      BACKGROUND AND FACTS

        The Court recites the following facts taken from the complaint and accepted as true for

the purpose of deciding Defendants' motion to dismiss, unless otherwise indicated.  Plaintiff

Darrin Cupo, D.M.D., "is a Florida licensed dentist who specializes in the field of orthodontics,

and who practices dentistry through Plaintiff Darrin Cupo, D.M.D., P.A."  (Notice of Removal,

Ex. A (Compl. ¶ 4).)  Plaintiffs allege that Cupo and OCA entered into a Management and

Business Services Agreement ("BSA") effective May 1, 1996.  (Notice of Removal, Ex. A

(Compl. ¶ 9).)  Plaintiffs further allege that the "economics of the BSA established a partnership

between Cupo and OCA in orthodontic offices located in Cutler Bay and Coral Springs, Florida."

(Notice of Removal, Ex. A (Compl. ¶ 10).)  "Under the terms of the BSA, Cupo received an

hourly fee for the provision of professional services to the practice's patients and OCA received

an hourly management fee for managing the business and administrative aspects of the practice."

(Notice of Removal, Ex. A (Compl. ¶ 11).)  "Under the BSA, the assets of the practice were

jointly held, with Cupo owning the patient contracts and OCA owning all of the physical assets

including orthodontic equipment, furnishings, leasehold improvements, and orthodontic

supplies."  (Notice of Removal, Ex. A (Compl. ¶ 12).)

        Plaintiffs allege that "OCA employed all staff at the practice and had exclusive control

over the administration of practice revenues."  (Notice of Removal, Ex. A (Compl. ¶ 13).)

Plaintiffs allege that "[a]fter payment of all practice expenses, including Cupo's salary and

OCA's management fees, Cupo and OCA split the net profits of the practice 50/50."  (Notice of

Removal, Ex. A (Compl. ¶ 14).)  Plaintiffs allege that "[o]n November 11, 2004, the BSA was

modified by written agreement, whereby the parties eliminated Cupo's hourly salary and OCA's hourly management fee, and revised the parties' division of profits to 65% for Cupo and 35% for OCA." (Notice of Removal, Ex. A (Compl. ¶ 15).)

Plaintiffs allege that "OCA's contribution to the orthodontic practice primarily consists of its marketing program involving television and radio advertising, and OCA's ability to bring more patients through the door," and that "[a]s such, OCA's management fees are directly earned or are conditioned on the referral of patients." (Notice of Removal, Ex. A (Compl. ¶ 49-50).) Plaintiffs further allege that "OCA's management fees do not bear any relation to the fair-market-value of the services it provides to the orthodontic practice and are solely representative of the practice's financial success."[3] (Notice of Removal, Ex. A (Compl. ¶ 51.)

B.    LEGAL STANDARD

Under Rule 12(b)(6), the defendant may move to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss, the Court must view the complaint in the light most favorable to the plaintiff, *Jenkins v. McKeithen*, 395 U.S. 411, 421-22 (1969). Moreover, "the scope of [the Court's] review is limited to the four corners of the complaint." *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002); *see also Brooks v. Blue Cross and Blue Shield of Florida*, 116 F.3d 1364, 1368 (11th Cir.1997) (observing that 12(b)(6) motions are "limited primarily to the face of the complaint and attachments thereto "). While a complaint does not need to set forth detailed factual allegations to survive a motion to dismiss, the factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted). "Once a claim

---

[3]The Complaint contains additional factual allegations relevant to the breach of contract claim contained in Count I. (Notice of Removal, Ex. A (Compl. ¶¶ 16-24).)

has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 1969; *see also* Fed. R. Civ. P. 8(a) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief").[4]   Moreover, the Court must, "at this stage of the litigation, . . . accept [the plaintiff's] allegations as true." *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984); *see also Brooks*, 116 F.3d at 1369.  Regardless of the alleged facts, however, a court may dismiss a complaint on a dispositive issue of law. *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 922 F.2d 1171, 1174 (11th Cir. 1993); *see also Wagner v. Daewoo Heavy Indus. Am. Corp.*, 289 F.3d 1268, 1270 (11th Cir. 2002), *rev'd on other grounds*, 314 F.3d 541 (11th Cir. 2002) (en banc) ("In assessing whether a complaint is sufficient . . . conclusory allegations, unwarranted factual deductions, and conclusions of law need not be accepted as true.").

"[W]here a cause of action stems from a contract that is attached to the complaint as an exhibit, the contract is considered part of the record for a Rule 12(b)(6) motion to dismiss.  If the contract demonstrates unambiguously that the plaintiff's relief is not merited, the claims should be dismissed." *Siedle v. Nat'l Ass'n of Secs. Dealers, Inc.*, 248 F. Supp. 2d 1140, 1143 (M.D. Fla. 2002) (citing *Jacksonville Newspaper Printing Pressmen & Assistants' Union No. 57 v. Florida Pub'g Co.*, 340 F. Supp. 993, 995 (M.D. Fla. 1972), *aff'd*, 468 F.2d 824 (5th Cir. 1972),

_____

[4]The Supreme Court recently "retired" the oft-quoted *Conley v. Gibson* standard that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which could entitle him to relief. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007) (discussing  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The Supreme Court's recent decision in *Twombly* clarified that the *Conley* Court's "no set of facts" language is a gloss on the accepted pleading standard that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 1969. The *Twombly* Court rejected a literal reading of the *Conley* "no set of facts" language and explained that the *Conley* language merely "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id*.

*cert. denied*, 411 U.S. 906 (1973)). The Eleventh Circuit has stated that "the threshold of sufficiency to which a complaint is held at the motion-to-dismiss stage is 'exceedingly low.'" *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 880 (11th Cir. 2003).

In general, the Court may not consider evidence submitted by the defendant in support of a motion to dismiss, and may not consider arguments based upon matters outside of the pleadings without converting the defendant's Rule 12(b)(6) motion to a motion for summary judgment. *See* Fed. R. Civ. P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."). However, the Eleventh Circuit has held that "the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (finding that a contract attached to the defendant's motion to dismiss, but not attached to the plaintiffs' complaint was central to the plaintiffs' complaint, and therefore did not necessitate conversion of the motion to dismiss into a motion for summary judgment because the plaintiffs' "references to the [ ] contract [were] a necessary part of their effort to make out [their] claim," and because the contents of the contract were not in dispute) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)). The *Day* court explained that "[i]n this context, 'undisputed' means that the authenticity of the document is **not** challenged," and further explained that "a document need **not** be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no

8

party questions those contents, [the court] may consider such a document provided it meets the centrality requirement imposed in *Horsley*." *Id.* (citing *Horsley*, 304 F.3d at 1134; *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999); *In re Silicon Graphics Inc. Secs. Litigation*, 183 F.3d 970, 986 (9th Cir. 1999)).

Here, Defendants have incorporated by reference and attached to the Motion to Dismiss Count II the following papers filed in the Yaffey Action: (a) Notice of Removal dated August 30, 2001 (including the Complaint for Declaratory Judgment and all documents attached thereto); (b) Defendant's Motion for Summary Judgment dated June 7, 2002; (c) Memorandum of Law in Support of Orthalliance, Inc.'s Motion for Summary Judgment dated June 7, 2002; (d) Report and Recommendation entered on February 14, 2003 by Magistrate Judge Barry L. Garber; (e) Order adopting the Report and Recommendation entered on March 26, 2003 by Judge Federico A. Moreno. (Defs.' Request for Judicial Notice ¶¶ 2-4 & Exs. A-E.) For the limited purpose of recognizing the "judicial act" that each document represents or the subject matter of the Yaffey Action litigation, the Court has taken judicial notice of these documents. Plaintiffs dispute the findings of facts upon which the Yaffey Action court's finding—that the contract at issue in the Yaffey Action was enforceable and did not violate the Florida Statutes, Florida public policy or any other aspect of Florida law—was based. However, the Court has not taken judicial notice of the court's findings of fact in the Yaffey Action. Nevertheless, despite the fact that the documents—to the extent they have been judicially noticed—are not disputed, the papers filed in the Yaffey Action and incorporated by reference and attached to the Motion to Dismiss Count II are not central to Plaintiffs' complaint. As such, the Court cannot properly consider the Yaffey Action documents without turning Defendants' motion to dismiss into a motion for summary judgment. *See Day*, 400 F.3d at 1276; *Horsley*, 304 F.3d at 1134. Thus, the Court will resolve

the motion to dismiss without considering the Yaffey Action documents, and without converting the motion to dismiss into a motion for summary judgment.[5]

C.    ANALYSIS

Plaintiffs' claim for declaratory relief is based on the following allegations: (1) that "[u]nder the BSA, OCA has a 35% beneficial ownership interest in the orthodontic practice, shares in the practice expenses, controls the practice leases, and owns the practice's hard assets," and that OCA's ownership in the orthodontic practice, through which OCA "engages Cupo in the practice of orthodontics," is in violation of Florida Statutes § 466.0285[6] and Florida

_____

[5]The Court notes that even if it were to consider the Yaffey Action documents in deciding Defendants' motion, the documents would not provide a basis for dismissal of Plaintiffs' declaratory judgment claim.  With respect to the issue of the legality of the parties' service agreement under Florida law, Magistrate Judge Garber's report and recommendation and Judge Moreno's order adopting the report and recommendation in the Yaffey Action were based on the court's examination of the express provisions of the service agreement at issue in the Yaffey Action *and* the plaintiff's testimony with respect to the actual practices and activities of the parties pursuant to that service agreement.  (Defs.' Request for Judicial Notice Exs. D & E.) The Court notes that—as in the instant action—in the Yaffey Action, the plaintiffs asserted that despite the plain language of the service agreement at issue, the parties' alleged activities and practices under the relevant service agreement violated Florida law.  (Defs.' Request for Judicial Notice ¶¶ 2-4 & Exs. A-E.)  The court in the Yaffey Action therefore considered the plaintiff's testimony with respect to the parties' activities and practices under the relevant service agreement—and *not* just the plain language of the contract—in deciding the legality issue. (Defs.' Request for Judicial Notice ¶¶ 2-4 & Exs. A-E.)

[6]Florida Statutes § 466.0285 provides:
(1) No person other than a dentist licensed pursuant to this chapter, nor any entity other than a professional corporation or limited liability company composed of dentists, may:

(a) Employ a dentist or dental hygienist in the operation of a dental office.

(b) Control the use of any dental equipment or material while such equipment or material is being used for the provision of dental services, whether those services are provided by a dentist, a dental hygienist, or a dental assistant.

(c) Direct, control, or interfere with a dentist's clinical judgment. To direct, control, or interfere with a dentist's clinical judgment may not be interpreted to mean dental

10

services contractually excluded, the application of alternative benefits that may be appropriate given the dentist's prescribed course of treatment, or the application of contractual provisions and scope of coverage determinations in comparison with a dentist's prescribed treatment on behalf of a covered person by an insurer, health maintenance organization, or a prepaid limited health service organization.

Any lease agreement, rental agreement, or other arrangement between a nondentist and a dentist whereby the nondentist provides the dentist with dental equipment or dental materials shall contain a provision whereby the dentist expressly maintains complete care, custody, and control of the equipment or practice.

(2) The purpose of this section is to prevent a nondentist from influencing or otherwise interfering with the exercise of a dentist's independent professional judgment. In addition to the acts specified in subsection (1), no person who is not a dentist licensed pursuant to this chapter nor any entity that is not a professional corporation or limited liability company composed of dentists shall enter into a relationship with a licensee pursuant to which such unlicensed person or such entity exercises control over the following:

(a) The selection of a course of treatment for a patient, the procedures or materials to be used as part of such course of treatment, and the manner in which such course of treatment is carried out by the licensee;

(b) The patient records of a dentist;

(c) Policies and decisions relating to pricing, credit, refunds, warranties, and advertising; and

(d) Decisions relating to office personnel and hours of practice.

(3) Any person who violates this section commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(4) Any contract or arrangement entered into or undertaken in violation of this section shall be void as contrary to public policy. This section applies to contracts entered into or renewed on or after October 1, 1997.

Fla. Stat. § 466.0285.

[7]Florida Administrative Code r. 64B5-17.013 provides in relevant part:
(1) No corporation, lay body, organization, or individual other than a licensed dentist or a professional corporation or limited liability company composed of

dentists shall engage in the practice of dentistry through the means of engaging the services, upon a salary, commission, or other means of inducement, of any person licensed to practice dentistry in this state. ***

(2) No dentist shall enter into any agreement with a nondentist which directs, controls, or interferes with the dentist's clinical judgment, or which controls the use of any dental equipment or material while such is being used for the provision of dental services. Nor shall any dentist enter into an agreement which permits any entity which itself is not a licensed dentist to practice dentistry, or to offer dentistry services to the public through the licensed dentist. The clinical judgment of the licensed dentist must be exercised solely for the benefit of his/her patients, and shall be free from any compromising control, influences, obligations, or loyalties. To direct, control, or interfere with a dentist's clinical judgment shall not be construed to include those matters specifically excluded by subsection 466.0285(1)(c), F.S.

(3) For the purposes of this rule:

(a) The term "clinical" means having a significant relationship, whether real or potential, direct or indirect, to the actual rendering or outcome of dental care, the practice of dentistry or the quality of dental care being rendered to one or more patients.

(b) The term "control" shall mean to exercise authority or dominating influence over; having the authority or ability to regulate, direct, or dominate.

(4) A licensed dentist may enter into an agreement with a nondentist to receive "Practice Management Services." The term "Practice Management Services" is defined to include consultation or other activities or services offered by someone other than a Florida licensed dentist regarding one or more of the following types of products or services:

(a) The suitability of dental office space, furnishings and equipment;

(b) Staff necessary to operate a dental practice;

(c) Regulatory compliance expertise and services;

(d) Methods to increase productivity of a dental practice;

(e) Inventory and supplies required to operate a dental practice;

(f) Information systems designed to produce financial and operational data on the dental practice;

(g) Marketing plans or advertising to increase productivity of a dental practice;

(h) Site selection, relocation, design or physical layout of a dental practice; or

(i) Financial services such as accounting and bookkeeping, monitoring and payment of accounts receivable, payment of leases and subleases, payroll or benefits administration, billing and collection for patient services, payment of federal or state income tax, personal property or intangible taxes, administration of interest expense or indebtedness incurred to finance the operation of the dental practice, or malpractice insurance expenses.

(5) For purposes of implementing the provisions of Sections 466.0285, 466.003 and subsections 466.028(1)(g) and (z), F.S., no dentist shall enter into a practice management agreement with anyone other than a dentist or group of dentists which provides or offers to provide, whether by contract or employment, with or without fee, any practice management service which attempts to govern in any way, whether directly or indirectly, the clinical sufficiency, suitability, reliability or efficacy of a particular product, service, process or activity as it relates to the delivery of dental care. Practice management agreements between dentists and anyone other than a dentist or group of dentists shall not:

(a) Preclude or otherwise restrict, by penalty or operation, the dentist of record's ability to exercise independent professional judgment over all qualitative and quantitative aspects of the delivery of dental care;

(b) Allow anyone other than a dentist of record or the dentist of record's practice to supervise and control the selection, compensation, terms, conditions, obligations or privileges of employment or retention of clinical personnel of the practice;

(c) Limit or define the scope of services offered by the dentist of record or the dentist of record's practice;

(d) Limit the methods of payment accepted by the dentist of record or the dentist of record's practice;

(e) Require the use of patient scheduling systems, marketing plans, promotion or advertising for the dentist of record or the dentist of record's practice which, in the judgment of the dentist of record or the dentist of record's practice, will have the effect of discouraging new patients from coming into the practice or discouraging patients of record from seeing the dentist or postponing future appointments or which gives scheduling preference to one individual, class or group of existing or new patients over another individual, class or group of existing or new patients;

"OCA's contribution to the orthodontic practice primarily consists of its marketing program involving television and radio advertising, and OCA's ability to bring more patients through the door," and that "[a]s such, OCA's management fees are directly earned or are conditioned on the referral of patients" in violation of Florida Administrative Code r. 64B5-17.013 (Notice of Removal, Ex. A (Compl. ¶¶ 48-50)); (3) that "OCA's management fees do not bear any relation to the fair-market-value of the services it provides to the orthodontic practice and are solely representative of the practice's financial success" in violation of Florida Administrative Code r. 64B5-17.013 (Notice of Removal, Ex. A (Compl. ¶ 51)); and that (4) the division of fees between OCA and Cupo under the BSA violates Florida Statutes § 817.505.[8] (Notice of

---

(f) Directly or indirectly condition the payment or the amount of the management fee on the referral of patients, and in addition, the management fee shall reasonably relate to the fair market value of the services provided;

(g) Penalize the dentist of record or the dentist of record's practice for reporting perceived violations of this section to, or seeking clarification from, appropriate state or federal agencies, departments or boards.

(6) For purposes of implementing the provisions of Section 466.028(1)(h), F.S., no dentist shall enter into any agreement, or series of agreements, with anyone other than a dentist or group of dentists, which violates the parameters established in subsections (4) or (5) above and entering into such a contract constitutes a de facto employment of the dentist by a nondentist. Except as permitted by Chapter 542, F.S., licensed dentists are prohibited from agreeing not to compete in the provision of dental services with any entity which is not itself a licensed dentist, or which is not licensed or otherwise permitted by law to provide the services which are the subject of the agreement not to compete.

(7) The provisions of this rule are not intended to impair the validity of any contract in existence as of the effective date of this rule. Any existing contract renewed or extended after the effective date of this rule shall be subject to the provisions of this rule.

Fla. Admin. Code r. 64B5-17.013.

[8]Florida Statutes § 817.505(1)(b) prohibits the solicitation or receipt of "any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any

Removal, Ex. A (Compl. ¶ 53).)

In their Motion to Dismiss Count II, Defendants argue that the "clear and unequivocal language of the BSA directly contradicts Plaintiffs' claims that the BSA violates Florida law," and that under "the plain language of the BSA, no construction of the factual allegations in the Complaint supports the claim for declaratory relief by Plaintiffs in Count II because the provisions of the BSA are not violative of any presently existing law."[9] (Defs.' Mem. of Law in Support of Mot. to Dismiss Count II ¶ 15.) Specifically, Defendants argue that the "plain language of the BSA contradicts Plaintiffs' claims that the BSA: (1) allows for the unauthorized practice of dentistry by engaging in services of a licensed dentist; (2) allows Defendants a 35% ownership interest in the practice and creates a partnership relationship; (3) directly or indirectly conditions payment of management fees on referral of patients; and (4) is in violation of § 817.505, Florida Statutes." (Defs.' Mem. of Law in Support of Mot. to Dismiss Count II ¶ 17.) Defendants assert that "[b]ecause these factual allegations are expressly covered in and directly contradicted by the BSA, the Court is precluded from accepting them as true.[10] (Defs.' Mem. of

_____

split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility." Fla. Stat. § 817.505(1)(b).

[9]Defendants also argue that the "claims made and the relief sought by Plaintiffs in Count II have already been rejected and denied in a similar action styled Mark A. Yaffey and Mark A. Yaffey Orthodontic Group, P.A. v. Orthalliance, Inc., Case No. 01-3715-CIV-MORENO, United States District Court for the Southern District of Florida [("Yaffey Action")], wherein this Court held a nearly identical Service Agreement did not violate the Dental Practices Act or any related Code provision," and that therefore "as a matter of law, Count II of the Complaint should be dismissed *with prejudice*." (Defs.' Mem. of Law in Support of Mot. to Dismiss Count II at 2.) For the reasons set forth more fully *supra*, the Court will resolve the motion to dismiss without considering the Yaffey Action documents and the arguments made in reliance on those documents.

[10]Defendants cite *International Star Registry of Illinois v. Omnipoint Marketing, LLC*, 510 F. Supp. 2d 1015, 1022 (S.D. Fla. 2007) ("[W]here there is a 'conflict between the bare

Specifically, Defendants argue that BSA Sections 3.1,[11] 2.3,[12] and 8.1[13] expressly cover

---

allegations of the complaint and any exhibit attached pursuant to Rule 10(c), Fed. R. Civ. P., the exhibit prevails.'") (quoting *Fayetteville Investors v. Comm. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) (concluding that the district court could consider the provisions of the contract attached to the complaint in determining whether the complaint, on its face, demonstrated as a certainty that the claim was barred by the applicable limitation period)), and *Sarria Holdings, Inc. v. Walgreen Co.*, No. 02-23169-Civ., 2003 WL 1528711, at *2 (S.D. Fla. Jan. 31, 2003).

In *International Star Registry*, the issue before the court was whether the plaintiff had sufficiently pled its breach of contract claims, and if so, which contracts were at issue in the case. *Int'l Star Registry*, 510 F. Supp. 2d at 1022. The parties in *International Star Registry* did not dispute the existence of a number of contracts between the parties, however they did "disagree as to which contracts were allegedly breached based on the language in the [c]omplaint." *Id*. The *International Star Registry* court "agree[d] that the [c]omplaint [did] not specifically delineate which contracts [fell] within the purview of the [c]omplaint," but the court noted that six contracts were attached as exhibits to the complaint, four of which were signed by a representative of the plaintiff, and therefore found that—in view of the rule that "where there is a 'conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c), Fed. R. Civ. P., the exhibit prevails'"—at the motion to dismiss stage, those contracts that were signed by a representative of the plaintiff were the contracts at issue in the case. *Id*. at 1022-23.

In *Sarria Holdings*, the court dismissed the plaintiff's breach of contract claim based on the plaintiff's allegations that the defendant breached a lease agreement between the parties by moving its business from the plaintiff's premises to a location across the street from plaintiff's property. *Sarria Holdings*, 2003 WL 1528711, at *2. The *Sarria Holdings* plaintiff did not allege that the lease agreement at issue specifically prohibited the defendant from moving its business; rather, the plaintiff alleged that "based on the behavior of the parties and the agreement as a whole, it [was] clear that [the defendant] should continue to operate its business on [the] plaintiff's premises." *Id*. The *Sarria Holdings* court reviewed the contract at issue, which was attached as an exhibit to the complaint, and found that the contract's terms were "clear and unambiguous about the parties' responsibilities, rights, and obligations." *Id*. The *Sarria Holdings* court further found that "[a] close reading of the [contract at issue] reveal[ed] that [the] plaintiff's claims conflict[ed] with the express language of the [contract ]." *Id*. Based on the express terms of the lease agreement attached to the complaint, which "addressed directly the plaintiff's claims," the *Sarria Holdings* court found that the defendant was "not in breach of the lease if it decide[d] to leave [the plaintiff's premises] because the lease clearly authorize[d] such an action," and in the event the action occurred, "the lease provide[d] recourse to the plaintiff, namely to terminate the lease." *Id*. at *3. Thus, based on the contract's terms, the *Sarria Holdings* court found that plaintiff did not allege any facts sufficient to support his claim for breach of contract. *Id*.

[11]Section 3.1(a) of the BSA provides:
3.1 <u>Professional Responsibilities</u>. (a) The Orthodontic Entity shall be solely

and directly contradict Plaintiffs' allegations that under the BSA Defendants engage Cupo in the practice of orthodontics in violation of Florida Statutes § 466.0285 and Florida Administrative Code r. 64B5-17.013. (Defs.' Mem. of Law in Support of Mot. to Dismiss Count II ¶¶ 18-19.) Based on these provisions of the BSA, Defendants contend that the BSA "is no more than an agreement to provide Practice Management Services, including consultation and other activities offered by Defendants to Plaintiffs." (Defs.' Mem. of Law in Support of Mot. to Dismiss Count II ¶ 18.) Defendants further argue that contrary to Plaintiffs' allegations, OCA's management fee is not conditioned on the referral of patients, and that marketing the business is expressly permissible under Florida Administrative Code r. 64B5-17.013. (Defs.' Mem. of Law in Support

---

responsible for the employment of all orthodontists who are employed at the Center, for the rendering of all dental and orthodontic services provided to patients of the Center, and for the supervision of all non-licensed staff of the Center who assist the Center's orthodontists in providing care to patients.

[12]Section 2.3 of the BSA provides:
2.3 Personnel Services. [OCA] will consult with the Orthodontic Entity on the Center's staffing needs and will employ and provide to the Orthodontic Entity the clerical, administrative and other non-licensed staff requested by it for the operation of the Center (the [sic] "Administrative Staff"). It is expressly understood and agreed that while the Administrative Staff will be employed by [OCA], all decisions concerning the Center's staffing (including staffing levels, hirings and terminations) shall be within the Orthodontic Entity's sole discretion. [OCA] will also provide payroll administration and accounting services for the Center's staff and, as requested, will consult with the Orthodontic Entity on profit sharing and bonus plans for the Center's staff (including the professional staff).

[13]Defendants point out that BSA Section 8.1 defines the relationship between OCA and Cupo as an independent contractor relationship. BSA Section 8.1 provides in relevant part: "8.1 Independent Relationship. [OCA] intends to act and perform as an independent contractor of the Orthodontic Entity and the Shareholder, and the provisions hereof are not intended to create any partnership, joint venture, agency or employment relationship between the parties."

of Mot. to Dismiss Count II ¶ 20.)  Defendants also argue that BSA Section 2.10[14] expressly

covers and directly contradicts Plaintiffs' allegations that under the BSA, OCA's management

fees are directly earned or are conditioned on the referral of patients in violation of Florida

Administrative Code r. 64B5-17.013.  (Defs.' Mem. of Law in Support of Mot. to Dismiss Count

II ¶ 20.)  Finally, Defendants argue that OCA's alleged payment of practice expenses—which

Defendants assert are paid for out of the gross revenue of Plaintiffs' practice under BSA Sections

4.1 and 4.2[15]—and OCA's alleged control of the practice leases and ownership of the 'hard

assets' under BSA Section 2.2,[16] are expressly permitted under Florida Administrative Code r.

---

[14]BSA Section 2.10 provides:
2.10. _Marketing_. [OCA] will provide the Orthodontic Entity with marketing advice, as requested, and, in consultation with the Orthodontic Entity, will design and execute a marketing plan to promote the Orthodontic Entity's services.  The marketing plan may include newspaper yellow pages, and radio and television advertising, special promotions and pricing programs, and direct marketing to employers, insurance companies, and other payors, as the Orthodontic Entity determines to be appropriate, it being expressly acknowledged and agreed that the Orthodontic Entity shall exercise control over all policies and decisions relating to pricing, credit, refunds, warranties and to the content and placement of advertising. Subject to the foregoing, [OCA] will also assist the Orthodontic Entity in establishing and administering an installment plan that will be offered to patients of the Center to facilitate their payment for services rendered by the Orthodontic Entity.

[15]Section IV of the BSA governs the "Financial Arrangements" between OCA and Cupo.

[16]BSA Section 2.2 provides:
2.2.  _Office, Space, Furnishings and Equipment_.  OCS will consult with the Orthodontic Entity on the Center's equipment and office needs, and provide to the Orthodontic Entity the office facilities, equipment and furnishings requested by the Orthodontic Entity for the operation of the Center.  OCS will additionally arrange for the upkeep and maintenance of the Center.  The Center's office facilities will be provided to the Orthodontic Entity pursuant to an office sublease (the "Office Sublease").  The Center's furniture, equipment, etc. will be provided to the Orthodontic Entity pursuant to a fixed asset lease (the "Fixed Asset Lease"); (The Office Sublease and the Fixed Asset Lease are referred to collectively as the "Center Leases and Subleases.")  Pursuant to the Center Leases and Subleases, the Orthodontic Entity shall have complete control and custody over the Center's

18

64B5-17.013. (Defs.' Mem. of Law in Support of Mot. to Dismiss Count II ¶ 22.)

In response to the motion to dismiss, Plaintiffs assert that despite any express provisions to the contrary contained in the BSA, the BSA creates a partnership relationship between Cupo and OCA.[17] (Pls.' Mem. of Law in Opp to Defs.' Mot. to Dismiss Count II at 4.) Further,

---

facilities, equipment, etc., consistent with the terms of a standard commercial lease or sublease. It is understood that any fixed asset activity undertaken by the parties in respect to the Center will be performed through the Fixed Asset Lease.

[17]Plaintiffs cite Florida Statutes § 620.8202, which governs formation of partnerships, and *Dreyfuss v. Dreyfuss*, 701 So. 2d 437, 439 (Fla. 3d DCA 1997) (explaining that "[a] partnership is only established when both parties contribute to the capital or labor of the business, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business," and that "[t]o establish a partnership, there must be a 'community of interest in performance of a common purpose, joint control or right of control, joint propriety of interest in subject matter, right to share in the profits, and duty to share in any losses which may be sustained.'" (citations omitted)). Florida Statutes § 620.8202 provides in relevant part:

(1) *** the association of two or more persons to carry on as coowners a business for profit forms a partnership, whether or not the persons intend to form a partnership.
*** 
(3) In determining whether a partnership is formed, the following rules apply:
*** 
(b) The sharing of gross returns does not, by itself, establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived.

(c) A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment:

1. Of a debt by installments or otherwise;

2. For services as an independent contractor or of wages or other compensation to an employee;

3. Of rent;
*** 
5. Of interest or other charge on a loan, even if the amount of payment varies with the profits of the business, including a direct or indirect present or future ownership of the collateral, or rights to income, proceeds, or increase in value derived from the collateral; or

Plaintiffs argue that in view of OCA's alleged "business model," which Plaintiffs assert is "premised on OCA's nationwide brand and mass media advertising designed to drive patients through the doors of its affiliated orthodontists . . . OCA's share of the net profits (its 'management fees') is directly earned or is conditioned on the referral of patients."  (Pls.' Mem. of Law in Opp to Defs.' Mot. to Dismiss Count II at 5.)  Finally, Plaintiffs argue that because OCA's management fee allegedly "fluctuates with the profitability of the practice, and, if not profitable, is negative," OCA's share of the profits "cannot conceivably relate to the value of the services provided."  (Pls.' Mem. of Law in Opp to Defs.' Mot. to Dismiss Count II at 5.)

After careful consideration of the record and the applicable Florida law, the Court finds that, viewing the factual allegations in the complaint in the light most favorable to Plaintiff, Defendants are not entitled to dismissal of Plaintiff's claim for declaratory relief (Count II).  The Court finds that, at the motion to dismiss stage, Plaintiffs have alleged facts sufficient to support their claim that the relationship between OCA and Cupo created under the BSA—and the parties' practices pursuant to the BSA—violates Florida law.  The Court finds that contrary to Defendants' assertions—and in contrast to *International Star Registry* and *Sarria Holdings*—this Court is not precluded from accepting as true Plaintiffs' factual allegations in support of their claim for declaratory relief, as theses factual allegations are not expressly covered in and directly contradicted by the BSA in the same manner that the contracts at issue expressly covered and directly contradicted the factual allegations in the complaints in *International Star Registry* and *Sarria Holdings*.  *See supra* note 10.  The Court reaches this conclusion based on the fact that

6. For the sale of the goodwill of a business or other property by installments or otherwise.

Fla. Stat. § 620.8202.

Plaintiffs do not claim that the express terms of the BSA violate Florida law; rather, Plaintiffs claim—and have alleged facts sufficient to support their claim—that the parties' practices and activities pursuant to the BSA, and the actual relationship between OCA and Cupo created under the BSA, violate Florida law. *See supra* note 5. Taking Plaintiffs' factual allegations to be true and construing them in the light most favorable to Plaintiffs, the Court cannot, as a matter of law, find that the parties practices pursuant to the BSA, and the relationship between OCA and Cupo created under the BSA are authorized under Florida law, and that the BSA is therefore valid and enforceable. Accordingly, the Court finds that Defendants are not entitled to dismissal of Plaintiff's claim for declaratory relief (Count II).

III.  DEFENDANTS' RULE 56(f) MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' PREMATURE CROSS-MOTION FOR SUMMARY JUDGMENT AS TO COUNT II OF PLAINTIFFS' COMPLAINT

As Defendants point out in their Rule 56(f) motion, this action has been pending before this Court only since November 20, 2007. One month later, in response to Defendants' motion to dismiss Count II, Plaintiffs filed their motion for summary judgment on December 20, 2007.

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. In this case, however, as Defendants point out, discovery has not commenced. The Eleventh Circuit has made clear that a court should not consider a motion for summary judgment until the party opposing the motion has had "an adequate opportunity to complete discovery." *See Jones v. City of Columbus*, 120 F.3d 248, 253 (11th Cir. 1997); *Ventrassist Pty. Ltd. v. Heartware, Inc.*, 377 F. Supp. 2d 1278, 1287-88 (S.D. Fla. 2005). Thus, because discovery has yet to begin in this

action, the Court finds that Plaintiffs' Motion for Summary Judgment is premature and should be denied at this time.  However, Plaintiffs may seek summary judgment at a later date if, once the parties have engaged in adequate discovery, the undisputed facts show that judgment should be granted in favor of Plaintiffs as a matter of law.  Fed. R. Civ. P. 56.  Accordingly, it is hereby

ORDERED AND ADJUDGED that Defendants' Request for Judicial Notice is GRANTED in accordance with this Order.  It is further

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss Count II With Prejudice is DENIED in accordance with this Order.  It is further

ORDERED AND ADJUDGED that Defendants' Rule 56(f) Motion for Extension of Time to Respond to Plaintiffs' Premature Cross-Motion for Summary Judgment as to Count II of Plaintiffs' Complaint is GRANTED in accordance with this Order.  It is further

ORDERED AND ADJUDGED that Plaintiff's Cross Motion for Summary Judgment as to Count II of Plaintiffs' Complaint is DENIED WITHOUT PREJUDICE.  It is further

ORDERED AND ADJUDGED that Plaintiffs' requests that the Court enter an Order requiring Defendants to pay Plaintiffs' reasonable expenses incurred in responding to the motion for extension of time, including attorneys' fees and hold Defendants and Gibson Pratt in contempt is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 14th day of January, 2008.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided:
counsel of record